FRANK J. SAXE, Surviving Partner of Himself and CHARLES G. SAXE, Doing Business under the Firm Name of SAXE BROTHERS, Respondent, *v.* PENOKEE LUMBER COMPANY, Appellant.

*Contract of sale — measure of damages upon a breach by the vendor — duty of the vendee to make his damages as small as possible — evidence of his ability to do so.*

Upon the breach of a contract, for the sale and delivery of merchandise, the ordinary measure of damages is the difference between the contract and the market price at the time and place of delivery.

The party injured by the breach of a contract must so act as to make his damages as small as he reasonably can; this principle applies as well to cases where general damages, as to cases where special damages, are alleged.

Where the vendee brings an action for damages because of the vendor's failure to deliver goods sold, the vendor is entitled, with a view to reducing the damages, to show that the vendee could have obtained from a third party goods of the same kind and character as were called for by the contract at the contract price.

LANDON and PUTNAM, JJ., concurred in the result; PARKER, P. J., dissented; MERWIN, J., not sitting.

APPEAL by the defendant, the Penokee Lumber Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Albany on the 8th day of January, 1895, upon the report of a referee.

The plaintiff is the surviving member of the copartnership of Saxe Brothers, a copartnership which was engaged in the business of buying and selling lumber; the defendant is a corporation engaged in the business of manufacturing lumber, having mills in Wisconsin, and its principal office at Tonawanda, N. Y.

On the 31st day of January, 1890, the defendant sent to Saxe Brothers a letter, which in part reads as follows: "We hereby offer you, for prompt acceptance, lumber on the following prices, terms and conditions: Quantity of lumber to be six million feet, quality No. 2 cutting up and better, the whole guaranteed to average as good a quality as our 5-4 and 6-4 sold to you by A. M. Dodge & Co., of this place last autumn. The above six million feet of lumber is to be sawn from logs we are now getting out in Ashland Co., Wis., to be sawn at our mills at Morse Station, Ashland Co., Wis."

Then follows a statement of the dimensions of the lumber to be furnished. Then the following: "Delivery of above lumber to be f. o. b. canal boats at this place, we undertaking to deliver about 2 million feet on or before about July 1, '90, about 1½ million feet during the month of July, about 1½ million feet during the month of August, and the balance during the month of, September next; and in the event of all not being delivered before Oct. 1, '90, we are to pay such canal freight on any balance which we deliver after that date as may be in excess of the average rate of canal freights on such of this lumber as we deliver during the month of September next."

This lumber was to be furnished at the price of twenty-nine dollars and fifty cents per 1,000, but, by a subsequent letter, the first one was modified so that the amount of lumber to be furnished was

4,000,000 feet, and the price twenty-eight dollars and fifty cents per 1,000, which Saxe Brothers agreed to pay, and to advance upon the purchase price the sum of $40,000. They further agreed that, as the shipments of this lumber should be from time to time received by them, they would apply one-half of the contract price thereof upon such advancement of $40,000 and pay the remaining one-half of such price to the defendant. Subsequently, some question arising between the parties, the defendant, on the 15th day of September, 1890, agreed that the lumber thereafter delivered under the contract should be at the price of twenty-seven dollars and fifty cents per 1,000.

The mills of the defendant are known as the Penokee Mills, and the lumber manufactured by it is known as Penokee lumber.

For reasons which appear in the correspondence between the parties, and in the testimony in the case, it would seem that the defendant found itself unable to saw and put into merchantable shape at its mills a sufficient amount of lumber to meet the requirements of the contract during the season of 1890; and on the 31st day of October, 1890, in a letter directed to Saxe Brothers, the defendant said : " We have to say we cannot complete contract with you this season ; " and in a letter dated November 4, 1890, amongst other things, appears the following : " Kindly advise us as early as possible whether you wish to cancel contract, or have us complete same as early as possible next season."

On November 6, 1890, the defendant wrote a letter to Saxe Brothers, a portion of which reads as follows : " We hereby withdraw our statement that we cannot complete contract this season, and ask if you will accept, instead of Penokee stock, other lumber equally good and very similar to it in the matter of width, texture, dryness, etc. ? "

On the 5th of November, 1890, Saxe Brothers, in a letter directed to the defendant, say : " As to your question whether ' we wish to cancel the contract or have you furnish the lumber in the spring,' we can only answer by saying that we have sold the stock, or rather a large portion of it, and wish it sent forward this fall."

On the 12th of November, 1890, Saxe Brothers received 276,296 feet of lumber, amounting at the contract price to the sum of $7,598.14. Instead of applying one-half of such amount upon the

balance of the $40,000 due them, and sending the balance thereof to the defendant, they applied the whole amount thereof with the exception of $146.39, for which amount they sent a check to the defendant, balancing up the account between the parties. This was the last shipment of lumber by the defendant to the plaintiff's firm. The defendant delivered to the plaintiff's firm 2,791,100 feet of lumber, being a shortage on the contract of 1,208,900 feet.

In August, 1891, the plaintiff's firm commenced this action against the defendant, alleging a breach of contract and damages.

Upon the trial the defendant asserted that the first breach of the contract was upon the part of Saxe Brothers in refusing to pay over to it one-half of the contract price of the lumber received on the 12th of November, 1890.

The plaintiff asserted that the letters, extracts from which are above set forth, in which the defendant announced its inability to complete the contract, constituted a breach on its part, and that the withdrawal of that statement in the letter of November sixth, was only a conditional one, the condition being the acceptance of other lumber instead of Penokee stock.

The referee found against the defendant upon the questions thus raised, and found the measure of damages to be "The difference between the purchase price of the lumber, to wit, $27.50 per thousand feet, and its market value at the time and place of delivery, to wit, $32.50 per thousand feet."

The referee based his finding that the market value of the lumber at the place of delivery was thirty-two dollars and fifty cents per 1,000 feet, upon a letter of the defendant dated September 5, 1890, in which the defendant argumentatively asserted the value of the lumber to be thirty-two dollars and fifty cents per 1,000 feet. The president of the defendant, who wrote the letter, upon examination as a witness, swore that he meant by that, that he believed "They would have a gross profit of about $5.00 per thousand feet by selling it out in small lots."

Other facts and evidence will be adverted to hereafter in the discussion of the case.

*Henry H. Seymour*, for the appellant.

*William P. Rudd*, for the respondent.

HERRICK, J. :

Assuming, but not affirming, that the referee was correct in holding that there was a breach of contract upon the part of the defendant, in its notifications to the plaintiff's firm that it would not be able to supply the lumber contracted for during the season of 1890, and that its subsequent withdrawal of that notice was not sufficient, and assuming also that the letter of the defendant in regard to the value of the lumber at Tonawanda was sufficient evidence upon which to base a finding that its market value there was thirty-two dollars and fifty cents per 1,000 feet, there were still other questions in the case sufficient, it seems to me, to call for a reversal of the judgment.

Upon the breach of a contract for the sale and delivery of merchandise, the ordinary measure of damages is the difference between the contract and the market price at the time and place of delivery. (*Parsons* v. *Sutton*, 66 N. Y. 92.)

But there is another rule of damages, which is that the party who suffers a breach of contract must so act as to make his damages as small as he reasonably can. (*Parsons* v. *Sutton*, 66 N. Y. 92; *Roberts* v. *White*, 73 id. 375; *Wright* v. *Bank of the Metropolis*, 110 id. 237.)

The case of *Parsons* v. *Sutton* (*supra*) was one where there was a breach of a contract for the sale and delivery of paper to be used as a frontispiece for a magazine, which was to be delivered on the second day of June, to be used in printing the July number of the magazine; the paper was not delivered at the time called for by the contract, and the court in discussing it said : " There is no proof that such paper as this contract called for is not usually to be found in the market, or that it could not, in the small quantity required, be delivered in a few days by manufacturers. All defendants did was to go to dealers in paper a day or two after the second day of June, and try to buy paper like that which plaintiffs were to deliver, and they could find none. It does not appear that they made any further efforts. It does not appear that they could not find paper which would answer substantially the purpose. No reason is given why they did not try more than once to find the paper."

While the case of *Parsons* v. *Sutton* (*supra*) was one where special damages were alleged, the rule announced was not based

upon that fact. The principle " that the party who suffers from a breach of contract must so act as to make his damages as small as he reasonably can," applies just as much to cases where general, as to cases where special damages are alleged; the principle is the same in both cases.

The party injured is only entitled to recover such damages in any case as he necessarily sustains, and he does not necessarily sustain a damage that he could obviate by reasonable effort.

In this case there is no evidence that the plaintiff's firm made any efforts or inquiries to procure other lumber in place of that called for by the contract, or to ascertain if such lumber could be procured. I assume that they could not procure lumber of the kind in question, cut and sawed at the defendant's mill, lumber known as Penokee lumber ; that from the correspondence between the parties, the plaintiff's firm was warranted in believing that they had received all that there was to be had of that kind of lumber, and, therefore, that it would be useless for them to attempt to obtain it. But that, it seems to me, is not sufficient; there was no warranty or agreement upon the part of the defendant of the quality of lumber to be furnished, except that it should be as good in quality as that purchased the season before from A. M. Dodge & Co.

The plaintiff's firm were not purchasing it for any special purpose, but for general sale in the market. And there is no' pretense but that lumber cut from the same quality of pine into the same dimensions mentioned in the contract would have been just as saleable in the market and have answered the purposes of the plaintiff's firm equally as well as though it had been cut at the defendant's mill.

This is not a case where the lumber is purchased for a special purpose, as, when a person is engaged in the construction of a house, and for the interior woodwork desires some particular kind of wood which commends itself to his taste, there another kind of wood, although equally durable and equally fitted for the purpose, will not answer, the purchaser has a right to require the exact article he contracted for. In the contract in this case the essential things as to the lumber are, not the mill where it is to be cut, but that it shall be of the specified cut and dimensions, and in quality as good as that purchased the season before of A. M.,Dodge & Co.

In their complaint the plaintiffs do not allege or claim any special

damages because of the failure to receive lumber manufactured at the defendant's mills. It is an ordinary complaint for damages for breach of a contract for the sale and delivery of merchandise of a particular description, and must be governed by the ordinary rules governing such actions, and, if the plaintiff's firm could minimize the damages sustained by them by procuring lumber elsewhere of a like character, and which would answer the same purpose as that contracted for, it would be their duty to do so.

The case is absolutely barren of evidence of any effort or attempt whatever on the part of plaintiff's firm to reduce their loss by the alleged breach of contract or to procure lumber that would substantially comply with the contract.

If it was the duty of the plaintiff's firm, in endeavoring to minimize its loss by reason of the defendant's failure to fulfill the terms of the contract, to endeavor to procure lumber that would substantially comply with the terms of the contract, as was strongly intimated, if not directly held by the cases I have cited, then it was competent and material for the defendant to show that such lumber could have been obtained at or about the contract price. The evidence in the case shows that there was in Tonawanda, at the time of the alleged breach of contract on the part of the defendant, lumber of the same grades and sizes as that specified in the contract in question, but better in quality and more than sufficient in quantity to make up the 4,000,000 feet called for in the contract of the parties, and which would bring as much or more in the market as the product of the defendant's mills.

The referee has found that navigation on the Erie canal closed November 30, 1890, so that it would seem that there was ample time to procure this lumber at Tonawanda and receive it at Albany after either the defendant's notification that it could not furnish the balance, or after the last shipment was received, November 12, 1890.

The fact that it was of the grades and sizes, quality and amount I have stated, is absolutely undisputed in the case; such lumber belonged to the firm of A. M. Dodge & Co., and was at their docks in Tonawanda. The firm of A. M. Dodge & Co. and the defendant occupied the same business office at Tonawanda, and the business there of both concerns was conducted by the same office force.

The president and general manager of the defendant, being the same person who made the contract and carried on the correspondence in behalf of the defendant with plaintiff's firm, was also one of the members of the firm of A. M. Dodge & Co., and had general charge of their business at Tonawanda.

Upon the trial he was asked if he would have sold that pine lumber to the plaintiff's firm at the price mentioned in the contract, and he was also asked if he sold such lumber in the open market at Tonawanda in the month of November, 1890.

Both of these questions were objected to as immaterial and improper; the objections were sustained and the evidence excluded. I think those rulings were erroneous. It was competent for the defendant to show that the plaintiff's firm could have obtained that lumber, which, as we have previously seen, was of the same kind and character as that called for in the contract, except that it was better in quality, for the same price as that mentioned in the contract, which would reduce the damages to which they were entitled for the breach of the contract to a nominal sum.

The judgment should, therefore, be reversed, the referee discharged and a new trial granted, costs to abide the event.

LANDON and PUTNAM, JJ., concurred in the result; PARKER, P. J., dissented; MERWIN, J., not sitting.

Judgment reversed, with costs.